UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JEFFREY R. MABEE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:19-cv-432-JDL |
| | ) | |
| JANET ECKROTE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER STAYING PROCEEDINGS

Jeffrey Mabee and Judith Grace (collectively, "the Mabees") filed this slander of title action against their neighbors, Janet and Richard Eckrote, alleging that the Eckrotes have falsely claimed ownership of the intertidal land fronting the Eckrotes' property in Belfast on Penobscot Bay, which actually belongs to the Mabees (ECF No. 11). After I denied the Eckrotes' special motion to dismiss the complaint filed pursuant to Maine's anti-SLAPP statute, 14 M.R.S.A. § 556, (ECF No. 30), I took note of an ongoing state court proceeding between the parties that appeared to involve the same or a closely related controversy. I therefore requested that the parties brief the propriety of abstention pursuant to the doctrine set forth in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976) (ECF No. 33). The briefing is complete. For reasons I will explain, I conclude that abstention is appropriate in these circumstances and, therefore, order the case stayed.

## I. BACKGROUND

I sketched the factual underpinnings of this action in my prior order denying the Eckrotes' special motion to dismiss, but recount certain relevant facts here again.

The facts are derived from the allegations contained in the First Amended Complaint and attached exhibits (ECF No. 11), as well as the parties' representations regarding the progress of the state court proceeding (ECF Nos. 34, 35).  I also take judicial notice of the public state court records.  *See Squeri v. Mount Ida Coll.*, 954 F.3d 56, 61 (1st Cir. 2020).

The Mabees and Eckrotes each own parcels of land, separated by one other parcel of land, on Penobscot Bay in Belfast, as shown in the following illustration.[1]



In August of 2018, the Eckrotes entered into an agreement with Nordic Aquafarms, Inc., by which the Eckrotes would grant Nordic Aquafarms a subsurface easement to install and operate a pipeline under the Eckrotes' property, including the intertidal zone.[2]  The purpose of the pipeline is to allow Nordic Aquafarms to

---

[1]  This image is derived from the Mabees' Amended Complaint (ECF No. 11 at 3), but has been altered to remove the names of non-parties.

[2]  The details of this easement agreement—as well as the Eckrotes' specific assertions of ownership of the intertidal zone and Nordic Aquafarms' employment of those assertions in applying for various permits—on which the Mabees base their slander of title claim are set forth in my order denying the Eckrotes' special motion to dismiss.  Those details are not relevant to the question of abstention.

operate a land-based aquaculture facility that, as described by Maine Superior Court Justice Robert E. Murray in the related state case, "has great implications for the greater Belfast area."  ECF No. 35-1 at 2.

## A.    The State Court Action

On July 15, 2019, the Mabees filed a complaint in the Waldo County Superior Court against the Eckrotes, Nordic Aquafarms, and several other individuals, asserting that the Mabees, not the Eckrotes, own the intertidal strip in front of the Eckrotes' parcel.  The complaint included one count for quiet title to the intertidal strip and another count for a declaratory judgment to the same effect.  The Mabees also sought injunctive relief, although the record before me does not reveal the precise nature of that request.

In the fifteen months or so since the filing of that complaint, the matter has proceeded through multiple rounds of pleadings and motions to dismiss.  For instance, the Eckrotes have filed a counterclaim against the Mabees, asserting their own slander of title claim, and other parties have been joined.[3]  In early 2020, the court enjoined Nordic Aquafarms from seeking additional permits to install the pipeline, pending resolution of the case.  Discovery appears to be ongoing, although it is not clear from the parties' submissions precisely how far discovery has progressed or what a realistic timeline for the case's resolution may be, in light of the constraints imposed by the COVID-19 pandemic.

---

[3]  As of June 10, 2020, the parties involved in the state court case in some capacity are: the Mabees; the Eckrotes; Nordic Aquafarms; the owners of the lots on either side of the Eckrotes' lot; and two other organizations, Upstream Watch and the Friends of the Harriet L. Hartley Conservation Area.

The Mabees and Eckrotes also filed cross-motions for summary judgment in the state court, which included the Mabees' motion for summary judgment on the question of whether the Eckrotes own the intertidal strip. On June 4, 2020, Justice Murray issued an order that, among other things, denied the Mabees' motion for summary judgment, concluding that the record was insufficient to allow the court to determine, as a matter of law, that the Eckrotes did or did not own the intertidal strip.[4]

## B.    The Federal Action

The Mabees filed a complaint—which they later amended—against the Eckrotes in this Court on September 19, 2019, about two months after they began the state court case. Here, the Mabees assert only one count, slander of title. In short, the Mabees allege that they, not the Eckrotes, hold title to the intertidal strip and that the Eckrotes knew or should have known of the Mabees' ownership when the Eckrotes represented to Nordic Aquafarms that they own the strip.

On November 4, 2019, the Eckrotes filed a special motion to dismiss the complaint pursuant to Maine's anti-SLAPP statute, as well as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) and (7) (ECF No. 12). While the parties were briefing those motions, the overlap between the federal and state cases became apparent.

---

[4] Specifically, the court determined that the paper record was insufficient to determine whether a certain deed in the Eckrotes' chain of title had severed ownership of the intertidal strip from ownership of the upland because of lingering factual issues regarding the location of certain monuments. The court did not resolve the Eckrotes' counterargument that they had obtained title by acquiescence or adverse possession, but noted that "it is clear there is a dispute of fact about whether title by acquiescence or adverse possession could be proved." ECF No. 35-1 at 22 n.16.

After I denied the anti-SLAPP motion,[5] I held a hearing on the extent of this overlap and requested that the parties brief the propriety of *Colorado River* abstention.

## II.  DISCUSSION

"It has long been established that the presence of parallel litigation in state court will not in and of itself merit abstention in federal court," *Jiménez v. Rodríguez-Pagán*, 597 F.3d 18, 27 (1st Cir. 2010), and in general, "federal courts must abide by their 'virtually unflagging obligation' to exercise their lawful jurisdiction and resolve the matters properly before them," *Nazario-Lugo v. Caribevisión Holdings, Inc.*, 670 F.3d 109, 114 (1st Cir. 2012) (quoting *Colorado River*, 424 U.S. at 817).  In the service of "wise judicial administration," however, a federal court may stay or dismiss a case due to the pendency of parallel state court proceedings.  *Villa Marina Yacht Sales, Inc. v. Hatteras Yachts*, 915 F.2d 7, 12 (1st Cir. 1990) (quoting *Colorado River*, 424 U.S. at 818).  Abstention "is permissible only in 'exceptional' circumstances," however, and there is a "heavy presumption favoring the exercise of jurisdiction."  *Id.* at 13 (quoting *Colorado River*, 424 U.S. at 818).

"An evolving list of factors exists to aid in discerning whether a particular case involves exceptional circumstances" to counsel abstention.  *Nazario-Lugo*, 670 F.3d at 115.  These factors include:

> (1) whether either court has assumed jurisdiction over a res; (2) the geographical inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether state or federal law controls; (6) the adequacy of the state forum to protect the parties' interests; (7) the vexatious or contrived nature of the federal claim; and (8) respect for the principles underlying removal jurisdiction.

---

[5]  In my order denying the Eckrotes' anti-SLAPP motion, I did not address their 12(b) motion (ECF No. 12), which remains pending.

*Id.* (quoting *Jiménez*, 597 F.3d at 27-28). "This list is by no means exhaustive, nor is any one factor necessarily determinative," *KPS & Assocs., Inc. v. Designs By FMC, Inc.*, 318 F.3d 1, 10 (1st Cir. 2003), and "[t]he weight to be given any given factor depends on the circumstances at hand," *Nazario-Lugo*, 670 F.3d at 115. I turn to consider the factors relevant to this case.[6]

## A.   Jurisdiction over a *Res*

This component of the *Colorado River* analysis is "more concerned with the disposition of property than with the actual exercise of in rem jurisdiction," and is "more accurately described as a prudential doctrine in which a second court with concurrent jurisdiction will exercise its discretion to defer to another court for the sake of comprehensive disposition of rights in a particular piece of property." *Jiménez*, 597 F.3d at 28 n.6 (quoting *Levy v. Lewis*, 635 F.2d 960, 965-66 (2d Cir. 1980)). The point is to try to avoid the "possibility for inconsistent dispositions of property." *Id.* at 28.

This case creates a prime "possibility for inconsistent dispositions of" the intertidal strip in front of the Eckrotes' parcel. *Id.* In order to prevail on their slander of title claim, the Mabees must establish that they have a "legally protected interest" in the intertidal strip. *Colquhoun v. Webber*, 684 A.2d 405, 409 (Me. 1996) (quoting

---

[6] In this case, two of the enumerated factors—the relative convenience of the fora and the principles underlying removal jurisdiction—are neutral or, at most, minimally relevant. Regarding convenience, any difference between Belfast (state court) and Bangor (federal court) is negligible, as both courthouses are in relatively close proximity to one another. *See Burns v. Watler*, 931 F.2d 140, 147 (1st Cir. 1991). Moreover, both cases are proceeding on paper or electronic records at this point, and at least in the federal forum, the likelihood of a testimonial hearing in the next few months is slim due to the COVID-19 pandemic. *See* D. Me. General Order 2020-14 at 2 (amended Oct. 6, 2020). As to the eighth factor, removal jurisdiction is irrelevant here.

Restatement (Second) of Torts § 624 cmt. c (Am. Law Inst. 1977)).    Despite the Mabees' best efforts to make their ownership of the intertidal strip appear a foregone conclusion, however, the state court's June 4th order denying the Mabees' motion for summary judgment on the issue of the Eckrotes' waterside boundary—including its statement that the Eckrotes' acquiescence and adverse-possession claims raise triable issues of fact, *see* ECF No. 35-1 at 22—reveals that the strip's ownership is anything but settled.    The state court, indeed, appears to be heading towards a trial on precisely that issue.    A ruling from this Court, whether favorable to the Mabees or not, could lead to inconsistent determinations of the intertidal strip's ownership.

This factor therefore weighs heavily in favor of abstention.

## B.    Avoiding Piecemeal Litigation

"Piecemeal litigation," in the *Colorado River* analysis, refers to "more than just the repetitive adjudication that takes place in all cases implicating [the] *Colorado River* doctrine." *Jiménez*, 597 F.3d at 29.    To carry weight in the analysis, this component requires "some additional factor that places the case beyond the pale of duplicative proceedings." *Id.*    The mere fact that parallel federal-state adjudication would result in two courts "deciding the same issues" does not weigh in favor of abstention." *Villa Marina*, 915 F.2d at 16.    The assessment of this factor "should focus on the implications and practical effects of litigating suits deriving from the same transaction in two separate fora . . . , and weigh[s] in favor of dismissal only if there is some exceptional basis for dismissing one action in favor of the other." *KPS & Assocs.*, 318 F.3d at 10-11 (citations and quotation marks omitted).

For instance, a "dispute between a vendor and its sales representative over sales commissions present[ing] a straightforward application of state laws" did not present an exceptional basis because it was "of primary importance only to the immediate parties" to the federal suit. *KPS & Assocs.*, 318 F.3d at 11 (alterations and quotation marks omitted). By contrast, a substantial "disparity in inclusiveness" between the two actions, arising in situations "when non-diverse parties are joined in the state-court action but not the federal action," may constitute an exceptional basis because it creates the "potential for fragmented adjudication, to be distinguished from merely duplicative adjudication." *Jiménez*, 597 F.3d at 30; *see also Liberty Mut. Ins. Co. v. Foremost-McKesson, Inc.*, 751 F.2d 475, 477 (1st Cir. 1985) (holding that dismissal of a federal action was appropriate because the state action, "which was commenced first, [was] the more comprehensive of the two" because it "involve[d] all of [the insured's] insurers and all of the products for which [the insured] face[d] potential liability").

The circumstances of this case are more in line with the latter cases than the former. This federal action involves only two parties, but a ruling on the merits of the Mabees' case—which, as I have already explained, would require this Court to determine who owns the intertidal strip—would have major implications for the state case, which involves several other interested parties, is more substantively comprehensive, and has important public implications for the region.[7] Although it is true that, as the Mabees suggest, they seek different relief in the two proceedings—

---

[7] The record reflects that the administrative proceedings surrounding Nordic Aquafarms' pipeline proposal have attracted substantial public comment and engagement.

quiet title, declaratory relief, and an injunction in the state court, but only damages here—in order to obtain that relief in either court, they must demonstrate ownership of the intertidal land at issue.  It is difficult to see, and the Mabees do not explain, how these mutually exclusive *remedies* obviate the fact that, were I to exercise jurisdiction, the factual and legal underpinnings of that ownership claim would be litigated in a fragmentary manner.

By the same token, abstention in these circumstances would not prejudice the Mabees' slander of title claim, should they eventually prevail in state court.  Although the Mabees would need to return here for resolution of the knowledge or intent element of their slander of title claim, as well as damages, those discrete factual issues are not presented in the state court action and do not involve any of the other parties to that action.

After considering the implications and practical effects of parallel litigation in this case, I conclude that the "disparity in inclusiveness" between the federal and state actions—both in terms of the parties represented and the broader public interests at stake in the state action—in combination with the "fragmented" nature of the litigation that would result from proceeding with the federal case at this time, present an "additional factor that places the case beyond the pale of duplicative proceedings."  *Jiménez*, 597 F.3d at 29.  This factor weighs heavily in favor of abstention.

## C.    Order of Jurisdiction

"The order in which jurisdiction was taken is not a mechanical concept" based on the respective dates of filing, "but rather a concept that favors the case that is the

more advanced at the time the *Colorado River* balancing is being done." *Jiménez*, 597 F.3d at 30-31 (alterations omitted) (quoting *Elmendorf Grafica, Inc. v. D.S. Am. (East), Inc.*, 48 F.3d 46, 52 (1st Cir. 1995)). That a state court action is "well into the discovery stage" and has a "head start into the merits" weighs in favor of abstention. *Id.* at 31.

Although the state court obtained jurisdiction only two months prior to this Court—a fact that would not, in itself, bear much consideration—that proceeding is significantly further advanced than this case. The state court has already dispensed with multiple summary judgment motions and has, accordingly, developed some fluency with the records and chains of title, whereas this action still has a pending motion to dismiss and has not yet reached discovery. This factor weighs in favor of abstention.

## D.   Whether State or Federal Law Controls

This factor is more than a question of whether state or federal law predominates in the matter. Although it may be "significant that no federal issues are raised in [the federal court action] and that no federal interest would be served by retaining jurisdiction over the case," *Liberty Mut. Ins. Co.*, 751 F.2d at 477, the First Circuit has also observed that this factor supports abstention "only when a case presents 'complex questions of state law that would best be resolved by a state court,'" *Villa Marina*, 915 F.2d at 15 (quoting *Am. Bankers Ins. Co. of Fla. v. First State Ins. Co.*, 891 F.2d 882, 886 (11th Cir. 1990)); *accord KPS & Assocs.*, 318 F.3d at 11.

Not only is there no question of federal law anywhere in this pure diversity case, but the "difficulty of the substantive state law questions" involved, *Villa*

*Marina*, 915 F.2d at 15, appears to be substantial.  The Mabees contend that the determination of the knowledge or intent element of their slander of title claim is legally straightforward.  Even if that were true,[8] I would not be able to resolve the claim without determining whether the Mabees own the intertidal strip, *see Colquhoun*, 684 A.2d at 409, and that question is evidently intricate and tightly wound enough to have survived at least one summary judgment wringer.  The state court's summary judgment decision undertakes a lengthy and detailed analysis of Maine case law on the interpretation of littoral deeds, but did not resolve the issue. Nothing suggests that this Court is better equipped to answer this question of Maine property law, especially given the state court's head start on the matter.[9]

I conclude that this case presents "complex questions of state law that would best be resolved by a state court."  *Villa Marina*, 915 F.2d at 15 (quoting *Am. Bankers Ins. Co.*, 891 F.2d at 886).  This factor also supports abstention.

**E.    Adequacy of the State Forum**

*Colorado River* abstention "is appropriate only where the parties may obtain complete relief in the state court proceedings."  *Currie v. Grp. Ins. Comm'n*, 290 F.3d 1, 12 (1st Cir. 2002); *see Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 28 (1983) (stating that a court may not stay a case under *Colorado River* "[i]f

---

[8]  Although slander of title is, as the Mabees assert, a "straight-forward garden variety tort," ECF No. 35 at 6, neither party has yet made arguments regarding this element that are sufficient to determine how complex an inquiry it will require.

[9]  The Mabees assert that because the state court resolved certain subsidiary legal arguments in its summary judgment order, it would be a simple matter for this Court to "take testimony" on the remaining factual issues.   Notwithstanding that this Court is not currently holding in-court evidentiary hearings in civil cases due to the COVID-19 pandemic, it would be far more efficient for the state court to resolve this question given its greater familiarity with the issues and record involved.

there is any substantial doubt as to" whether "the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties"). "[T]he adequacy of the state forum[] operates against the surrender of jurisdiction only where the state forum may not be adequate to adjudicate the claim[]." *Rojas-Hernandez v. P.R. Elec. Power Auth.*, 925 F.2d 492, 496 (1st Cir. 1991).

The Mabees argue that the state forum is inadequate because of the slow pace of those proceedings. The First Circuit has not addressed whether a speed differential between the two fora may establish "inadequacy" for purposes of this factor,[10] and other Circuit Courts have not reached a firm conclusion on the question. *Compare Vill. of Westfield v. Welch's*, 170 F.3d 116, 122, 124 (2d Cir. 1999) (stating that, where the state court had "invested over thirteen years in the matter," the federal trial court "had no discretion to assume that the state court was an adequate vehicle for the 'prompt resolution' of the issues" (quoting *Moses H. Cone*, 460 U.S. at 28)), *with Montanore Minerals Corp. v. Bakie*, 867 F.3d 1160, 1169 (9th Cir. 2017) ("This factor concerns whether the state court might be unable to enforce federal rights." (quotation marks omitted)), *and Am. Int'l Underwriters (Philippines), Inc. v. Cont'l Ins. Co.*, 843 F.2d 1253, 1259 (9th Cir. 1988) ("[T]he mere fact that the . . . state court has stayed its action temporarily does not make the state court proceeding inadequate."). Even if the pace of the litigation in state court were relevant to this factor, however, the state court here has been anything but dilatory. In the

---

[10] Instead, as I have already explained, the First Circuit has typically assessed the relative progress of the two proceedings as part of the "progress of litigation factor." *Nazario-Lugo*, 670 F.3d at 118.

12

approximately fifteen months since the Mabees filed their state-court complaint—which they have twice amended—the court has already resolved several motions to dismiss, ordered the joinder of additional parties, and ruled on cross-motions for summary judgment. As the Mabees appear to recognize, the speed of the state court proceedings is the consequence of the greater complexity and inclusivity of the issues, claims, and parties in that case, rather than any delay on the part of the court itself. Indeed, despite that case's relative complexity, the state court proceeding is currently closer to a trial than this federal action. Furthermore, although the Mabees have not yet brought a slander of title claim in the state court, they have pointed to nothing precluding them from doing so, nor have they otherwise suggested that the state court could not adequately protect their interests.

Because the state court can afford the Mabees "complete relief" for the injury they allege here, this factor is neutral. *Currie*, 290 F.3d at 12.

## F.    Vexatious or Contrived Nature of the Federal Case

This factor is intended to query "the motivation for the second lawsuit." *Villa Marina*, 915 F.2d at 15. For instance, if a party goes "to federal court solely in reaction to its failure in the [state] court, that fact should be held against it in the *Colorado River* balance." *Id.*

The Eckrotes assert that this lawsuit is "an attempt to increase the . . . cost of litigation and apply financial pressure to" them. ECF No. 34 at 14. There are some circumstances that tend to suggest that the Mabees' turn to federal court is less than perfectly innocent. For instance, it would be surprising if the Mabees (citizens of Maine) would shrink from state court in fear of local bias; the Eckrotes (citizens of

New Jersey) are the nominal outsiders here. Moreover, the fact that the Mabees filed this action while the state court case was still comparatively straightforward and limited in scope, and could more easily accommodate the addition of the Mabees' slander of title claim, supports the Eckrotes' theory.

On the other hand, the Mabees' prosecution of this federal action has not been marked by excessive or duplicative filings or delay. In both proceedings, the parties appear to have moved things along at a steady clip, especially in light of the state court case's expansion in inclusivity and comprehensiveness. The Eckrotes might understandably prefer that the Mabees not have filed this case, but on this record, I cannot conclude that they did so vexatiously or in accordance with some improper scheme. Therefore, this factor is neutral.

## G.    Balancing the Factors

In determining whether to stay the proceedings under the *Colorado River* doctrine, I must bear in mind that abstention "is permissible only in 'exceptional' circumstances" and that there is a "heavy presumption favoring the exercise of jurisdiction." *Villa Marina*, 915 F.2d at 12-13 (quoting *Colorado River*, 424 U.S. at 818). Nevertheless, I am convinced that the potential for this action to effectively determine the result of the far more comprehensive and inclusive state court case presents an exceptional circumstance demanding abstention under *Colorado River*.

In reaching this conclusion, I rely most heavily on the first two factors: (1) the "possibility for inconsistent dispositions of property," and (2) the "disparity in inclusiveness" creating a "greater practical risk of piecemeal litigation than the baseline inefficiencies of the average exercise of concurrent federal-state jurisdiction."

14

*Jiménez*, 597 F.3d at 28, 30. The Mabees' primary argument against abstention—that their slander of title action only requires resolution of whether the Eckrotes knew of the Mabees' allegedly superior claim to title—puts the cart before the horse. As I have described, the very question of who holds title to the intertidal land remains uncertain and hotly contested, and a federal court judgment on the Mabees' slander of title action could throw a preclusive wrench into the far more comprehensive and inclusive state court action. The fact that the other factors are either neutral or support abstention also indicates that abstention is warranted.

In these circumstances, a stay, rather than dismissal, is proper, in order to "leav[e] the docket open in case loose ends remain at the conclusion of the state proceedings." *Jiménez*, 597 F.3d at 31; *see Bacardí Int'l Ltd. v. V. Suárez & Co., Inc.*, 719 F.3d 1, 16 (1st Cir. 2013) ("In situations involving parallel state court litigation where deferring the exercise of jurisdiction is proper, this circuit has historically ordered a stay rather than a dismissal.").

### III. CONCLUSION

For the foregoing reasons, it is **ORDERED** that the matter is **STAYED** pending final disposition in the state court proceeding. In the interim, if either party believes that a substantial change in circumstances has occurred that merits reconsideration of this order, they may move to lift the stay. In light of the stay, the Eckrotes' motion to dismiss pursuant to Rule 12(b)(6) and (7) (ECF No. 12) is **DENIED AS MOOT**. Should the stay be lifted, they will be able to renew the motion.

**SO ORDERED.**

**Dated this 15th day of  October, 2020**

                                         _____/s/ JON D. LEVY_____
                                         **CHIEF U.S. DISTRICT JUDGE**